JACK W. REIFF AND JUDITH REIFF, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Reiff v. Commissioner
Docket No. 2530-71.
United States Tax Court
T.C. Memo 1974-20; 1974 Tax Ct. Memo LEXIS 300; 33 T.C.M. (CCH) 91; T.C.M. (RIA) 74020; January 28, 1974, Filed. Roy L. Weiss, for the petitioner. H. Stephen Kesselman, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION
SCOTT, Judge: Respondent determined a deficiency of $1,133 in petitioners' Federal income tax for the calendar year 1967. The issue for decision is whether respondent properly disallowed the amount of $3,685 claimed by petitioners to be deductible as medical 2 expenses incurred for tuition and transportation to the Baldwin School of New York City (hereinafter Baldwin) for their daughter Amy. FINDINGS OF FACT
Some of the facts have been stipulated and are found accordingly.
Jack W. and Judith Reiff (hereinafter referred to as petitioners), husband and wife, resided in Bronx, New York at the time of the filing *301 of the petition in this case. Petitioners filed a joint Federal income tax return for the calendar year 1967 with the district director of internal revenue, Manhattan District, New York.
During the taxable year 1967 petitioners' minor daughter Amy was a student at Baldwin.
Petitioners' daughter Amy was born in 1954 and was adopted by them when she was 14 months old. At the age of 8, Amy underwent heart surgery and, following the operation, she began to exhibit certain emotional problems. Petitioners noticed that the child was withdrawing more and more into herself, was not as affectionate as before, and was experiencing academic and social problems in school. When Amy was about 10 years old, petitioners decided to seek professional 3 help and in 1964 consulted a psychiatrist who treated Amy for over one year. Petitioners did not feel that this year of therapy had helped Amy in any way, so they sought other advice. They were recommended to Helmuth Gumprecht, a practicing certified psychologist and trained psychoanalyst who had done his undergraduate studies in Germany and held a Master's degree from Columbia University Teacher's College. Amy began seeing Gumprecht twice *302 weekly after the summer of 1966. She continued to see him until she went to college. When Gumprecht first began to treat Amy, she was so withdrawn that she was totally uncommunicative. In his opinion, Amy suffered from massive paranoia and suicidism, leading to the development of a condition known as childhood schizophrenia. He began to treat Amy regularly and saw her for therapy sessions twice a week.
Gumprecht recommended that Amy be taken out of public school and placed in a private school where she would not be subjected to large classes and impersonal surroundings. In Gumprecht's opinion, a private school was better equipped in general to handle children with emotional problems, since classes were small and teachers were more aware of and sensitive to their pupils' emotional difficulties. He felt that Amy would be able 4 to function and succeed in a private school atmosphere and furthermore that the small size of the classes and personal attention given to each pupil would assauge the child's anxiety about relating to others.
Gumprecht recommended several schools to petitioners, who eventually selected Baldwin. Amy began Baldwin sometime in late 1966 or early 1967. *303 Petitioners paid $3,032 tuition in 1967. They also paid $653 for Amy's transportation expenses, since Gumprecht advised against allowing her to use public transportation.
Baldwin is a private school, whose founder, Baldwin, held a doctorate in education. The school had approximately 250 students in 1967, with a staff of approximately 35 and an average of 12 students in a class. Gumprecht recommended Baldwin because he considered the school to be therapeutic for disturbed chilren such as Amy. He had another patient in the school and felt that attendance at Baldwin had helped this other child in terms of alleviation of anxiety. In Gumprecht's opinion, Baldwin's curriculum and intimate atmosphere would protect Amy from unnecessary pressures and would make it possible for her to function educationally.
In 1967 Baldwin accepted youngsters with learning difficulties. Although the school had students in that 5 year who did not have learning difficulties, the majority of students attending Baldwin in 1967 were in need of individual attention. There was no difference in the tuition charged to children with learning difficulties and children without such difficulties at Baldwin. *304 Approximately 20 percent of the students were receiving some therapy outside the school. Some of the teachers at Baldwin had psychological training, although none of them were psychologists. The school's guidance counselor was also trained in psychology and after leaving her position at Baldwin, she received her Ph.D. in psycholoy. None of the personnel of Baldwin, however, gave psychological treatment to Amy, although they were helpful and supportive in their contacts with the students. None of the teachers consulted regularly with Gumprecht, Amy's therapist, although he made himself available to them if needed. The only staff member at Baldwin who had medical training was the school nurse, who performed normal school nurse duties such as giving first aid and taking health histories. The qualifications of the teachers at Baldwin were in most respects comparable to those of the teachters in the public schools.
Baldwin did not accept severely disturbed children with aggressive tendencies or serious physical and mental handicaps.The school in 1967 was composed 6 mainly of students of average and above-average intelligence with good potential, who could be helped to succeed *305 academically by individual attention and special education programs such as remedial reading. The staff at Baldwin would try to help the student by placing the student comfortably in an academic program where with honest effort the student would succeed. In years since 1967, Baldwin has increased its staff and increased its enrollment. Baldwin has not changed the nature of its student population but has continued to accept a heterogeneous group of pupils somewhat similar to the students in public schools.
Amy was not a disciplinary problem at Baldwin, although she did not relate well to her fellow students and to some of her teachers. Amy did not receive any formal special treatment while at the school, although she was at all times recognized as a child with special problems and was dealt with in a manner considered by the schools's staff to be proper in light of her special problems. Amy was not stringently monitored at Baldwin. Even though Gumprecht had recommended that she not use public transportation to and from school, Amy was free to leave the classroom and the 7 school premises during the day whenever she felt the need, and in fact did so. Petitioners on their joint *306 Federal income tax return for the year 1967 claimed as a medical deduction that year's cost of their daughter's tuition at Baldwin of $3,032, plus the cost of her transportation to and from Baldwin, in the amount of $653. Respondent in his notice of deficiency disallowed this claimed deduction.
OPINION
Section 213, I.R.C. 1954[1] provides for the deduction of medical care expenses. Section 213(e) defines "medical care" expenses as those for the "diagnosis, cure, mitigation, treatment, or prevention of disease, or for the purpose of affecting any structure or function of the body" and "for transportation primarily for and essential to medical care * * *,".
Section 1.213-1(e) (1) (v) (a), Income Tax Regs., which we have held to be a reasonable interpretation of the statute, Martin J. Lichterman, 37 T.C. 586, 596 (1961) explains that
[while] ordinary education is not medical care, the cost of medical care includes the cost of attending a special school for a mentally or physically handicapped individual, if his condition is such that the resources of the institution 8 *307 for alleviating such mental or physical handicap are a principal reason for his presence there. In such a case, the cost of attending such a special school will include the cost of meals and lodging, if supplied, and the cost of ordinary education furnished which is incidental to the special services furnished by the school. Thus, the cost of medical care includes the cost of attending a special school designed to compensate for or overcome a physical handicap, in order to qualify the individual for future normal education or for normal living, such as a school for the teaching of braille or lip reading. Similarly the cost of care and supervision, or of treatment and training, of a mentally retarded or physically handicapped individual at an institutions is within the meaning of the term "medical care." (Emphasis Supplied.)
Under this regulation, in order for Amy's total expenses of attending Baldwin to be deductible, the evidence must show that Baldwin was a "special school" within the meaning of the regulation. If Baldwin is not considered a "special school" then the only amount of payment to Baldwin which might be deductible would be an amount paid for any medical care given *308 Amy at the school.
There have been a number of cases some permitting and some denying a deduction for all or part of private school tuition paid for a child who has been shown to be emotionally disturbed. See for example, Hobart J. Hendrick, 35 T.C. 1223 (1961); Martin J. Lichterman, supra; Paul H. Ripple 54 T.C. 1442 (1970); Lawrence D. Greisdorf, 54 T.C. 1684 (1970). We have recognized 9 that because of the difficulty of distinguishing personal educational expenses of an emotionally disturbed child from payments for medical care a careful analysis should be made of the evidence not only to determine if the school the child attended is a "special school" but also to determine to what extent the services rendered to the child are educational and to what extent the services are medical care. See C. Fink Fischer, 50 T.C. 164, 176 (1968)H. Grant Atkinson, Jr., 44 T.C. 39, 48 (1965).
In our view Baldwin had neither the medical facilities nor the therapeutic orientation in its curriculum to characterize it as a "special school." See C. Fink Fischer, supra and compare Lawrence D. Greisdorf, supra. *309 The founder of the school held a Ph.D. degree in education, but had no background in psychology. Neither he nor his staff of teachers possessed or were required to obtain special training in handling emotionally disturbed children. The school did not employ psychologists or psychiatrists whose therapy could be integrated into the school's normal academic programs. Although Amy was sent to Baldwin upon the recommendation of her psychologist-therapist, Gumprecht, her medical treatment was continued by 10 Gumprecht at all times separately and apart from her academic studies. In fact, Gumprecht testified that he did not expect the staff at Baldwin to treat Amy's psychological and emotional problems, nor would he deem this advisable since such additional therapy might conflict with and be harmful to his own treatment of the child.
As is evident from the record before us, Baldwin's structure was not geared toward the cure, mitigation, or treatment of any of its students' mental diseases. Like any other private school of its kind, the school maintained a good academic program with small classes and individualized tutoring to aid its students in their education. There is nothing *310 to indicate that the staff in any way purported to counsel its pupils in any matters other than academic. While the school's emphasis on individualized attention and the teachers' awareness of a student's emotional problems were no doubt helpful to Amy and other students with emotional problems, the facts show that the staff of Baldwin considered the students' emotional problems to be merely incidental to the dominant concern of the school of providing them with a good academic education similar to programs of other private schools. Our analysis 11 of Baldwin's structure and function vis-a-vis its students leads us to conclude that Baldwin is not a "special school" within the meaning of the regulations.
Petitioner has urged us to find the instant case to be similar to the Greisdorf and Fischer cases, supra. However there are factors present in those cases crucial to the holding there reached which are absent here. In Greisdorf the school which the child attended was shown to have been established to provide a learning environment for children with emotionally-caused learning disabilities. Its staff was trained in psychology and met regulary, with the aid, if necessary, of *311 consulting psychiatrists, to develop a consistent approach for dealing with each student's emotional problems. The evidence in Greisdorf showed that the educational aspects of the school were merely incidental to its principal goal of eliminating or reducing the mental or emotional causes of the learning disabilities of its students and that a child was sent to that school principally to derive therapeutic benefits and to further treatment of his or her emotional problems.
In Fischer, we found that the school served a dual function of providing normal educational instruction as well as helping children overcome mental and emotional problems, and held that only that protion of the tuition 12 which could be allocated to medical services actually rendered in the form of psychotherapy and counseling sessions was deductible. In Fischer, we did not categorize the school as "special," but rather recognized the deductibility of medical expenses in the form of fees to psychologists and psychiatrists. In the Fischer case there was much stronger proof than is present in the instant case that the school specialized in handling children with academic problems engendered by mental or emotional *312 illness and made an effort to provide an optimum therapeutic environment. However we allowed a deduction only for those expenses related proximately to the prevention or mitigation of the child's mental disease.
The facts in the instant case resemble more closely the facts in Paul H. Ripple, supra than those in the Greisdorf and Fischer cases. In Ripple the facts showed that the school the child attended concentrated primarily on academic training. Although some members of the staff of the school to which the taxpayer in Ripple paid fees had degrees in psychology, the school did not maintain personnel other that a consulting psychiatrist to deal with a student's emotional problems. The taxpayer's child was sent to that school upon recommendation of his doctor who kept 13 in touch with the staff there. The child's medical care, however, was received from his private doctor, independent of the school, and treatment of his emotional problems was not integrated with treatment of his learning difficulties. We concluded in Ripple that the school was not a special school so as to allow the taxpayers a deduction for tuition paid. Here as in the Ripple case we conclude *313 that Baldwin was not a "special school" within the meaning of the regulations. Also, in our view the facts here do not show that Amy received any medical care at Baldwin. We therefore hold that Amy's tuition at Baldwin and her transportation to school are not deductible medical expenses.
Petitioners have argued alternatively that some portion of Amy's tuition expenses should be deductible, at least to the extent that Baldwin's tuition exceeded that of the average New York City private school at that time. Petitioners assert that the additional cost was paid for special services available at Baldwin. Assuming this to be a fact, there is no showing that these special services were in the nature of medical care so as to be deductible. Amy did not receive any reconstructive or supportive psychotherapy or any counseling other than academic from the staff at 14 Baldwin, nor other services which could be considered akin to medical care. As we stated in Paul H. Ripple, supra, at 1447:
Whether a service constitutes medical care depends upon its therapeutic nature to the individual involved. * * * Rev. Rul. 67-339, 1967-2 C.B. 126. There must be a proximate *314 relationship between the medical deficiency of the individual and the service he received. * * * It must be established that the tuition was paid for services provided by the [school] which with respect to [the child] childwere primarily medical in nature rather than educational.
Petitioners have not shown what services, if any, Amy received at Baldwin other than academic training. The mere fact that small classes and individual attention may have incidentally been less destuctive for the child than a public school setting is insufficient to support petitioners' claim that Amy received medical care at Baldwin. The facts show that Amy attended Baldwin to get an education while she received medical care outside the school from her own therapist, Gumprecht. Gumprecht testified that he did to some extent keep in touch with Amy's teachers, but this was to check on her progress in school rather than to integrate her therapy with her academic training. He did not meet regularly with Amy's teachers, but simply was "available" to the school if necessary. Considering all the evidence in light of the requirements of the 15 statute and the regulations, we find that Amy received no *315 specific medical care at Baldwin and that classroom services provided by Baldwin did not have a proximate relation to Amy's emotional disturbance. Therefore, no part of the tuition or transportation expenses paid by petitioners in 1967 is deductible as medical care for Amy.
Decision will be entered for the respondent. _,5p3 Footnotes
1. All references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩